## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTELLIGENT DISCOVERY
MANAGEMENT, LLC, and BALINT BROWN
& BASRI, LLC,

               Plaintiffs,

    v.

OMNIVERE HOLDING COMPANY, LLC,
OMNIVERE, LLC, and ERIK S. POST.

               Defendants.

Civil Action No. _____

## COMPLAINT

Plaintiffs Intelligent Discovery Management, LLC, and Balint Brown & Basri, LLC, through their undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.     This is an action by Intelligent Discovery Management, LLC ("IDM") and Balint Brown & Basri, LLC ("B3") seeking damages resulting from defendants' misrepresentations and fraudulent conduct relating to IDM's receipt of Class B Units of OmniVere Holding Company, LLC. OmniVere, LLC acquired substantially all of plaintiffs' assets pursuant to an asset purchase agreement and provided the Class B Units to IDM pursuant to a simultaneously-executed operating agreement described below. Further, IDM and B3 seek damages and injunctive relief for defendants' breaches and misrepresentations relating to the operating agreement and their refusal to honor the terms of the operating agreement. Further, IDM and B3 seek damages and injunctive relief for defendants' breaches and misrepresentations relating to the asset purchase agreement.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under, among other things, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.   Upon information and belief, subject matter jurisdiction is independently available pursuant to 28 U.S.C. § 1332.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. §1391(b)(2); 28 U.S.C. §1391(c)(2), and pursuant to a forum-selection agreement in the Operating Agreement.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone and internet communications.

## PARTIES

6.      Plaintiff Intelligent Discovery Management, LLC ("IDM") is a New York limited liability company with its principal place of business in New York.   IDM was a provider of litigation support and e-discovery services.   As set forth herein, IDM invested in 1,153,846 Class B Units of OmniVere Holding Company, LLC, based on defendants' misrepresentations.

7.      Plaintiff Balint Brown & Basri, LLC ("B3") is a New York limited liability company with its principal place of business in New York.   Plaintiff B3 was a provider of temporary legal staffing to law firms and corporations.   As detailed below, IDM and B3 are affiliated and under common ownership.

8.      Defendant OmniVere Holding Company, LLC ("OmniVere Holding") is a Delaware limited liability company.  Upon information and belief, OmniVere Holding's principal place of business is in Chicago, Illinois, and its Class A members are residents outside of New York.

9.      Defendant OmniVere, LLC is a Delaware limited liability company.  Upon information and belief, OmniVere, LLC's principal place of business is in Chicago, Illinois.  Upon information and belief, OmniVere, LLC is a wholly-owned subsidiary of OmniVere Holding (together, "OmniVere").  OmniVere launched its operations after acquisitions involving a number of e-discovery providers, and advertises itself as a provider of "end-to-end eDiscovery" and "data risk management" with a number of branches in the United States and Europe.

10.     Upon information and belief, Defendant Erik S. Post is a resident of Winnetka, Illinois.  Post was a founder of OmniVere.  During the relevant period, he was the CEO of OmniVere Holding, and the CEO and President of OmniVere, LLC.

11.     As a founder, CEO and President of OmniVere, Post was privy to a) the true financial condition of OmniVere Holding and OmniVere; b) false statements made by OmniVere to its banking lender by misleading it regarding the financial information provided by IDM and B3, in order to meet the financial benchmarks set by the bank; and c) OmniVere's premeditated scheme to claim immediately that it was defrauded by plaintiffs in order to provide the bank with a pretext for not meeting the benchmarks, and as a way to reclaim IDM's Class B Units in OmniVere Holding.

12.     In addition, Post, by reason of his status as a senior executive officer of OmniVere and a member of OmniVere Holding, is a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause OmniVere to engage in the unlawful

conduct complained of herein.  Because of his position of control, Post was able to and did, directly or indirectly, control the conduct of OmniVere's business.

## OMNIVERE'S BUYING SPREE

13.     Plaintiffs IDM and B3 operated together with another entity, Kopy International LLC ("Kopy International") under common ownership and as part of a growing litigation support and e-discovery business known as "Superior Discovery."   These entities were owned by Simeon Friedman and Eva Friedman.

14.     IDM and B3 were late additions to the Superior Discovery brand, having been purchased in 2012 and 2013, respectively.  As part of the streamlining of operations, most of the e-discovery operations were moved over to IDM, but Kopy International still had certain data processing operations and employees.  There were also a number of legacy customer contracts and vendor agreements that were formally still with Kopy International.

15.     In April and May of 2014, OmniVere launched an acquisition spree, scooping up a number of e-discovery vendors and similar providers in an effort to build a multi-state e-discovery powerhouse.  The individual most active in pursuing these acquisitions on behalf of OmniVere was Post, the CEO of OmniVere Holding and the CEO and President of OmniVere, LLC.

16.     Upon information and belief, OmniVere obtained financing of approximately $40 million, with most of the funding coming from a lender institution, Medley Capital Corp. ("Medley").

17.     However, Medley was only willing to finance OmniVere's aggressive acquisition plans if OmniVere could show that the financials of the potential acquisition met certain

benchmarks.   Medley insisted that each acquired asset or company have certain EBITDA benchmarks.

18.     Plaintiffs did not have direct interactions with the bank and were not privy to whatever benchmarks Medley had set for OmniVere and Post.

19.     In or about February 2014, OmniVere commenced negotiations with representatives of IDM, B3 and Kopy International.   Gadi Rosenfeld, who was the CEO of plaintiffs at the time, handled the negotiations with OmniVere.

20.     OmniVere retained several attorneys and accountants to conduct due diligence and was provided broad access to financial records and business operations.

21.     Post did not want Kopy International to be part of the deal because Kopy International was not a profitable entity.   Upon information and belief, the inclusion of Kopy International would have made it more difficult for OmniVere to obtain financing from Medley.

22.     At the behest of the Post and OmniVere's attorneys, the parties went through an analysis of the operations of Kopy International to decide which items were made part of IDM, such that it would be included or excluded from the deal, as the case may be.

23.     The analysis and back-and-forth relating to Kopy International involved Post, as OmniVere's CEO, and its attorneys in dozens of emails and phone calls and the review of numerous spreadsheets.   Upon information and belief, Post specifically directed OmniVere's due diligence accountants not to review Kopy International's financials.

24.     After weeks of due diligence and negotiations, the parties signed an Asset Purchase Agreement on May 5, 2014, dated as of April 30, 2014, between OmniVere, LLC, on the one hand, and, IDM and B3, on the other hand (the "APA").   Kopy International was not a direct party to the APA.   OmniVere Holding was also not a party to the APA.

25.     Pursuant to the APA, on the day of the closing, IDM and B3 received approximately $9.9 million in cash (most of which paid off outstanding bank loans). Additionally, IDM received preferred equity of OmniVere Holding in the form of 1,153,846 Class B Units of OmniVere Holding, valued at $2 million (some of the units were later transferred to an employee, leaving IDM with 1,089,743 units).  The Class B Units are governed by the OmniVere Holding Company, LLC Operating Agreement, signed and dated as of May 5, 2014 (the "Operating Agreement").

26.     The APA and the Operating Agreement were unusual in a particular respect: a number of documents that were purportedly part of the agreements or that affected the terms of the agreements were not shown to IDM and B3.  OmniVere representatives claimed that these documents needed to remain confidential because of the simultaneous acquisitions and their discussions with Medley.  Thus, a number of attachments to the agreements were instead listed as "on file with OmniVere" or simply omitted from the exhibits.  OmniVere and Post, however, provided written and oral representations regarding the contents of the withheld documents.

27.     Plaintiffs relied on these written and oral representations.  But, as shown below, these statements were false.  OmniVere and Post were scheming all along.

## OMNIVERE'S MISREPRESENTATIONS REGARDING THE VALUE OF THE CLASS B UNITS

28.     According to the APA, the Class B Units were valued at $2 million.  This number of shares and the value of the shares were based on Post's written and oral representations that, upon closing, OmniVere's annualized forecasted revenue immediately would be "$40 million in sales and $10 million EBITDA."

29.     This statement was confirmed in writing on or about April 17, 2014, by Post to Gadi Rosenfeld, who was the President and CEO of IDM and B3.  (Rosenfeld worked closely

with Post on the deal and continued to work as a consultant to OmniVere post-closing until he was terminated by OmniVere.)

30.     These repeated statements were wildly false.  In fact, OmniVere's internal written projections of annualized revenue for the same period and structure were millions of dollars less than what Post presented to plaintiffs.

## OMNIVERE'S MISREPRESENTATIONS REGARDING THE
## THE TERM LOAN AGREEMENT WITH MEDLEY

31.     The Class B Units held by IDM are governed by the Operating Agreement and are structured as a preferred equity.   However, there are a number of restrictions on Class B distributions and option rights based on a document referred to as the Term Loan Agreement, including restrictions that are specific to the Class B Unit.   Upon information and belief, the Term Loan Agreement is a loan document between Medley and OmniVere.

32.     OmniVere refused to show the Term Loan Agreement to IDM.   However, OmniVere made a number of misrepresentations regarding the contents of those documents and its relationship with Medley.

33.     Post informed plaintiffs in writing that in addition to the financing for the immediate acquisitions, OmniVere also had a "war chest" for additional acquisitions, and that OmniVere had already secured a $3 million revolving line of credit that would assist OmniVere in financing its business operations following the acquisition of IDM and B3's assets.

34.     Post sent an e-mail to Rosenfeld on February 13, 2014, stating: "We will have a revolver to cover the AR and funding for staffing. . . . I also have a $10M acquisition line to handle some of the smaller transactions that we will want to pursue. . . . Let me know if you have any other questions. I am looking forward to getting this done!!"

35.     Further, immediately prior to the closing, Post told Benjamin Friedman, a vice president at IDM and B3, that OmniVere had a new lender lined up that would allow OmniVere to refinance its Medley loans within a matter of weeks.  (This was important to plaintiffs because a refinancing would trigger distributions for the Class B Units.)

36.     These statements were false.  Immediately after the closing there was no mention of any refinancing.  According to statements by Rosenfeld, who continued to work with Post as a consultant for OmniVere, within weeks of closing on its acquisitions, OmniVere was scrambling to secure a line of credit.

## POST DEFRAUDS OMNIVERE'S LENDER

37.     As previously stated, Post did not want Kopy International to be a direct party to the deal.  At the behest of Post and OmniVere's attorneys, the parties went through an analysis of the operations of Kopy International to decide which assets and liabilities would be carried over to IDM such that they would be included or excluded from the deal, as the case may be.

38.     For example, during the negotiations, OmniVere counsel sent the following email to counsel for IDM and B3:

> Also, I will call you tomorrow to discuss the liens on the Kopy assets that were transferred to IDM – our thought is that it'd be much cleaner and easier to just exclude all those assets (except the employees) from the transaction since they are not necessary, rather than try to get rid of the liens.  I know we talked about this a couple weeks ago - we just need to make sure we correctly identify these excluded assets and liabilities in the APA.

39.     As was evident from plaintiffs' discussions with Post, he was aware that Kopy International had open creditor claims.  Indeed, according to statements by Rosenfeld who also remained with OmniVere post-closing, Post directly negotiated with three vendors of Kopy International prior to acquiring IDM and B3.

40.     Post and his agents deliberately did not disclose to Medley that Kopy International had open creditor claims, nor did he disclose the nature of the financials or the fact that the assets and liabilities of Kopy International were selectively being sold.

## OMNIVERE IMMEDIATELY DISAVOWS
## ITS OBLIGATIONS UNDER THE APA AND OPERATING AGREEMENT

41.     After OmniVere was satisfied through weeks of due diligence with the help of sophisticated counsel and accountants, it supposedly discovered immediately upon closing that it was the victim of a fraud.  Upon information and belief, Post created this pretext because Post knew that the Medley benchmarks would not be met and immediately sought to evade the discovery of and accountability for his own fraud.  Further, the CFO of OmniVere immediately disclaimed knowledge that Kopy International had previous debt or that any of Kopy International's previous assets and liabilities were part of the deal.  Indeed, OmniVere immediately began servicing contracts with customers whose contracts were with Kopy International, despite the fact that these contracts were not even listed in the APA.

42.     Indeed, OmniVere's post-closing conduct shows that OmniVere had never planned to honor its obligations with respect to the Class B Units that IDM had received.

43.     There was no transition.  Although the parties anticipated a wind-down period for Kopy International, the former owners were immediately barred from entry and prohibited from even taking their personal belongings.  Prior to the closing, Benjamin Friedman reached out several times to Post indicating his availability after the close to assist with the overall transition and wind-down of Kopy International.  Instead, on the day after closing, Benjamin Friedman was told not to come into the office to pick up his personal belongings and that his items would be shipped.

44.     In an effort to ingratiate himself with his new employer, the former CEO that stayed on as a consultant marched out a long-time employee and told her, "go, you belong with your people."

45.     Upon information and belief based on OmniVere's conduct immediately after the closing and its absurdly quick discovery of purported fraud, OmniVere did not intend to honor the Operating Agreement and the APA from the outset.

46.     Indeed, OmniVere began discussing ways not to honor the Class B Units provided to IDM just days after the closing.

47.     OmniVere also immediately began making alterations to pre-closing financial records.  The day after the closing, May 6, 2014, Simeon Friedman requested from OmniVere a copy of the Quickbooks files relating to IDM, B3 and Kopy International (as provided for in the APA).  After a delay of about 10 days, OmniVere provided the Quickbooks files.

48.     A forensic analysis of these Quickbooks files revealed that OmniVere had altered the pre-closing financial data set.  For example, certain transactions originally entered by OmniVere with a post-closing date had then been backdated by OmniVere to reflect a pre-close date.  Additionally, certain transactions in the Quickbooks files entered by plaintiffs prior to the closing were altered and post-dated.

## BREACHES OF THE OPERATING AGREEMENT

49.     IDM has been a member of OmniVere Holding with 1,089,743 Class B Units for over a year and a half.  However, it has not received any documentation relating to OmniVere, including any information relating to the units IDM owns.  In February 2015, plaintiffs requested, through their counsel, information regarding the status of the preferred shares (Class B Units).  The request was unanswered.

50.     OmniVere has indicated that it does not intend to honor the Operating Agreement as to the Class B Units owned by IDM based on the pretext of fraud.

51.     Further, upon information and belief based on the publicly available information regarding increases in the loan amounts provided by Medley, loans by a new lender, and personnel changes at OmniVere, OmniVere Holding has made either direct changes to the Operating Agreement or has made changes to the Term Loan Agreement that affect the rights of the Unit B holders, without the consent of IDM, in violation of the Operating Agreement.

## ADDITIONAL BREACHES OF THE APA

52.     Pursuant to the APA, a relatively small part of the Purchase Price included the Net Receivables Price.  The Net Receivables Price was derived by calculating the estimated value of IDM and B3's accounts receivable on the day of closing (in the case of IDM, using only 85% of the accounts receivable) and reducing that amount by the estimated accounts payable of IDM and B3.

53.     The parties expected the final numbers to be adjusted based on a post-closing review by both parties of the accounts receivable and accounts payable as of the date of the closing.  Accordingly, approximately $345,000 of the purchase price representing 20% of B3's accounts receivable was placed in an escrow account in the event that there were adjustments to the Net Receivables Price after the close.

54.     After the closing, defendants provided their proposed adjustments to the Net Receivables Price.  It was so haphazardly prepared and facially riddled with errors (e.g., double-entry payables and Kopy International payables that were not included in the APA) that it was subsequently withdrawn by defendants.  However, it took defendants almost a year to provide their updated adjustments, which was still inaccurate.  Upon receipt of defendants' updated

adjustment, plaintiffs requested a meeting to resolve the different proposed adjustments (as required by the APA). Defendants did not respond to the request.

55.     Plaintiffs are entitled to receive the funds in the escrow account. However, OmniVere, LLC has wrongfully refused to release these funds.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND SCIENTER

56.     Defendants made the above representations to induce plaintiffs to invest in the Class B Units. Said representations directly or proximately caused or were a substantial contributing cause of the damages sustained by IDM.

57.     Said representations were materially false and misleading in that they misrepresented the truth about OmniVere, its business and operations, and failed to disclose material adverse information.

58.     Defendants made these misrepresentations knowingly or recklessly and for the purpose and effect of misleading plaintiffs as to OmniVere's value and financial and operating conditions.

## UNDISCLOSED ADVERSE INFORMATION

59.     Defendants materially misled plaintiffs by providing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about OmniVere Holding, its business and operations, as detailed herein.

60.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs.

61.    As described herein, the representations made by defendants to plaintiffs, including statements to plaintiffs inducing them to purchase the Class B Units, were materially false and misleading.

## NO SAFE HARBOR

62.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false.

## COUNT I
Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
against All Defendants

63.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

64.    Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to: (i) deceive plaintiffs as alleged herein; and (ii) cause IDM to purchase the Class B Units at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

65.    The Class B Units, are securities, as defined in Section 3(a)(9) of the Exchange Act 15 U.S.C. §78c(a).

66.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon plaintiffs in an effort to induce IDM to purchase the Class B Units in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

67.    OmniVere Holding, OmniVere, LLC and Post, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of OmniVere Holding and OmniVere, LLC, as specified herein.

68.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure plaintiffs of OmniVere Holding and OmniVere, LLC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about OmniVere and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon plaintiffs.

69.     Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Post was a high-level executive at OmniVere; (ii) Post was privy to and participated in the creation, development and reporting of OmniVere's internal budgets, plans, projections and/or reports; and (iii) Post participated in OmniVere's dissemination of information to plaintiffs which he knew or recklessly disregarded was materially false and misleading.

70.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true facts as to OmniVere's value, its revenue and earnings, its fraud of its lender, and the scheme to immediately claim fraud as a pretext to the lender and as a scheme to disavow the APA and Operating Agreement upon closing.

71.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the value of the Class B Units securities were artificially inflated.  In ignorance of the fact that the statements and omissions of defendants were materially false and misleading, plaintiffs invested in the securities and were damaged thereby.

72.     At the time of said misrepresentations and omissions, plaintiffs were ignorant of their falsity, and believed them to be true. Had plaintiffs known the truth, which were not disclosed by defendants, plaintiffs would not have invested in the Class B Units.

73.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

74.     As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages in connection with their investment of the Class B Units.

## COUNT II
### Violation of Section 20(a) of
### the Exchange Act against Defendant Post

75.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

76.     Post acted as a controlling person of OmniVere Holding and OmniVere, LLC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, he had the power to influence and control and did influence and control, directly or indirectly, the decision-making of OmniVere, including the content and dissemination of the various statements which plaintiffs contends were false and misleading.    Post had unlimited access to OmniVere's business records and information and direct involvement in the day-to-day operations of OmniVere.

77.     As set forth above, defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Post is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Post's wrongful conduct, plaintiffs suffered damages in connection with their purchases of the Class B Units.

## COUNT III
### Common Law Fraud against All Defendants

78.     Plaintiffs repeat and reallege each and every allegation contained above.

79.     This Claim is brought by plaintiffs against all defendants based upon common law principles of fraud.

80.     Each of the defendants owed to plaintiffs a duty of full disclosure, honesty, and complete candor, as well as a duty to exercise reasonable care and to make a reasonable and diligent investigation of the statements provided to plaintiffs, including the statements identified above.

81.     For the purpose of inducing plaintiffs to enter into the Operating Agreement, the purchase the Class B Units and the APA, and with knowledge, the intent to deceive, or reckless indifference to plaintiffs, defendants employed a scheme and conspiracy to defraud as a part of which defendants made, or participated in the making of, material misrepresentations of fact to plaintiffs, and as a further part of which defendants concealed the true facts, and being bound to disclose, omitted to state material facts as set forth above.  Those representations and statements were not true and defendants did not believe them to be true.  Said acts by defendants were fraudulent, oppressive and malicious.

82.     Plaintiffs, at the time of said representations and omissions, were ignorant of the falsity of defendants' representations, and believed them to be true.  In reliance, directly and indirectly, upon said misrepresentations, and the fidelity, integrity and superior knowledge of defendants, and in ignorance of the true facts, plaintiffs were induced to and did enter into the Operating Agreement, the purchase of the Class B Units and the APA.  Had plaintiffs known the true facts, they would not have taken such action.  By reason thereof, plaintiffs have been damaged.

## COUNT IV
### Negligent Misrepresentation
### against All Defendants

83.    Plaintiffs repeat and reallege each and every allegation contained above, with the exception that previously stated assertions of intentional or reckless misconduct of defendants and all references to fraud are not incorporated herein for purposes of this claim.  For purposes of this claim, plaintiffs allege that defendants' conduct was negligent and not intentionally, recklessly and/or grossly negligent.

84.    This count is brought by plaintiffs against all defendants based upon common law principles of negligent misrepresentation.

85.    Given that, at defendants' insistence, certain documents were redacted from the APA and Operating Agreement and/or not shown to plaintiffs, defendants had a special duty to plaintiffs to make truthful and accurate statements regarding the nature and context of those documents.

86.    Defendants have negligently made false statements, misrepresentations and omissions of material fact to plaintiffs in connection with the Operating Agreement, the purchase of the Class B Units and the APA.

87.    In making said misrepresentations and statements, as alleged above, defendants failed to state material facts necessary (i) in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (ii) in order that plaintiffs would have all of the material facts necessary for an informed decision.  Among the direct and proximate causes of said misrepresentations and omissions to state material facts was the negligence and carelessness of defendants, and the absence of any reasonable basis for belief in the truth of such statements.

88.     At the time of said misrepresentations and omissions, plaintiffs were ignorant of their falsity, and believed them to be true.   In reliance, directly and/or indirectly, on said misrepresentations and in reliance upon the superior knowledge and expertise of defendants, plaintiffs were induced to enter into the Operating Agreement, the purchase of the Class B Units and the APA.  Had plaintiffs known the truth, they would not have purchased the Class B Units or entered into the Operating Agreement or the APA.  By reason thereof, plaintiffs have been damaged

89.     Those negligent misrepresentations have been more particularly described herein.

90.     Plaintiffs demand judgment against defendants for compensatory damages, punitive damages, pre-judgment and post-judgment interest, cost of suit and such other relief as the Court deems equitable and just.

### COUNT V
Breach of the Operating Agreement
<u>against All Defendants</u>

91.     Plaintiffs repeat and reallege each and every allegation contained above.

92.     IDM is a Class B Member of OmniVere Holding and entitled to all such rights under the Operating Agreement.

93.     Defendants have indicated that they will not honor the Operating Agreement and have breached the Operating Agreement by, among other things, (i) failing to provide any documents regarding the Class B Units, (ii) indicating that they will not make the distributions provided for in the Operating Agreement and/or divert the distributions, and directly or indirectly amending the term of the Operating Agreement without the consent of IDM.

94.     OmniVere Holding and OmniVere, LLC are all alter egos of one another.

95.     As a direct and proximate cause of defendants' breach, plaintiffs have been damaged by defendants.

96.     Plaintiffs are entitled to damages from defendants' breach of the Operating Agreement in the amount to be determined by the Court.

## COUNT VI
### Breach of the APA
### Against All Defendants

97.     Plaintiffs repeat and reallege each and every allegation contained above.

98.     Defendants have indicated that they will not honor the APA and have breached the Operating Agreement by, among other things, misrepresenting the value of the shares to provide any documents regarding the Class B Units and refusing to release the portion of the escrow funds.

99.     OmniVere Holding and OmniVere, LLC are all alter egos of one another.

100.    As a direct and proximate cause of defendants' breach, plaintiffs have been damaged by defendants.

101.    Plaintiffs are entitled to damages from defendants' breach of the APA in the amount to be determined by the Court.

## COUNT VII
### Tortious Interference with Contract
### Against All Defendants

102.    Plaintiffs repeat and reallege each and every allegation contained above.

103.    OmniVere, LLC was aware of the terms and provisions of the Operating Agreement.

104.    OmniVere Holding was aware of the terms and provisions of the APA.

105.    The breaches of the Operating and Agreement was committed at the direction and involvement of OmniVere, LLC, without right or justification, and induced the breach the Operating Agreement.

106.    The breaches of the Operating and Agreement were committed at the direction and involvement of OmniVere, LLC, without right or justification, and induced the breach the Operating Agreement.

107.    The breaches of the APA were committed at the direction and involvement of OmniVere Holding, without right or justification, and induced the breach the APA.

108.    As a result of this tortious interference, plaintiffs have sustained damages in an amount to be determine by the Court.

WHEREFORE, plaintiffs demand relief and judgment but no less than $2,347,000, as follows:

    (a) For compensatory damages and interest in an amount to be determined at trial, but which is currently in excess of approximately $2,347,000, plus costs, expenses and disbursements including reasonable attorneys' fees;

    (b) Declaratory judgment finding that defendants (i) breached the Operating Agreement; and (ii) breached the APA;

    (c) Injunctive relief barring any further breaches of the Operating Agreement, and barring defendants from any wrongful withholding or diverting of the distributions under the Operating Agreement, and from any further interference in IDM's rights to the Class B Units it holds;

    (d) Consequential damages in an amount to be determined at trial; and

(e)  Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

CONNOLLY GALLAGHER LLP

By:

Matthew F. Boyer (Del. Bar No. 2564)
Ryan P. Newell (Del. Bar No. 4744)
Mary I Akhimien (Del. Bar No. 5448)
1000 West Street, Suite 1400
Wilmington, DE  19801
Tel.:  302-757-7300
Fax:  302-757-7299
Email: mboyer@connollygallagher.com
          rnewell@connollygallagher.com
          makhimien@connollygallagher.com

*Attorneys for Plaintiffs*

OF COUNSEL:
Solomon N. Klein, Esquire
LAW OFFICE OF SOLOMON N. KLEIN
1410 Broadway, Suite 1802
New York,  New York  10018
Tel.:  (212) 575-0202
Fax:  (212) 575-0233
Email: sklein@solomonklein.com

*Attorneys for Plaintiffs*

Dated: December 8, 2015